Morning, Your Honor. I'm Gary Lassen for the Plaintiff, Larry Russell. This case presents the issues squarely of the role of the district court judge in ruling on a summary judgment in an age, race, and accompanying race 1981 action. We respectfully submit that the trial court or district court without a trial weighed evidence, except the characterizations of the evidence, and importantly treated this in large part as a series of discrete acts when in fact this case presents as much as any a case of continuous acts. Here we had a capable, experienced, over 50-year-old practicing dentist, the first member of his African-American family to have a college degree, not only a professional degree, although I would add as a side his brother and his cousin made a lot more money as NBA basketball players. He worked for his entire career in public health and dentistry. Not Bill Russell. Pardon me? Not Bill Russell. I'm sorry? Bill Russell was not one of the NBA basketball players. Kazzy Russell and Campy Russell were his. Not as good as Bill Russell. Okay. Okay, no. From San Francisco, right? The trial court here accepted the proposition and the characterization of the evidence that there was in fact evidence to overcome pretext. It's respectfully submitted that that amounts to in this case accepting, well, because we had a reason and our conclusion is that it was performance, that's enough. It isn't enough. What happened here, according to Dr. Russell, and by the way, the first time he ever saw these 12 incomplete charts that were selectively picked out from patients whose treatment was not completed when he was out on family medical leave act, was at his deposition. And statements were made by a reviewing dentist looking solely at the charts that he failed to meet the standard of care, such as there were too many cases where he sent the impression back for a redo. Well, the impression is done by a third-party lab, not the dentist. And Dr. Russell's position is that unless one looks at the x-rays, unless one looks at the mouth, you can't offer an opinion. Secondly, there was this allegation that a patient, non-English speaking, filed a complaint with the state dental board. And again, when she was later contacted, her complaint was that Dr. Russell didn't get to complete her treatment. Interestingly, the complaint was after Dr. Russell was already terminated, again, when he was out on family medical leave act. The argument advanced and accepted by the trial court is that a couple of comments rather early in his employment that lasted but 15 months, Dr. Russell heard statements from his much, much younger supervisor that you are a big black man and very intimidating. The first part of that Dr. Russell concedes is true, that he is a very big black man, but he's not intimidating. Similarly, not long after, she said, you're old, you remind me of my father, and I don't get along with my father. You didn't say you're old. Pardon me? I don't think the statement that he recounted was you're old. You know, I may have to retake that back, but in one version of it, it refers to old, and I seized upon that this morning or last night. And I may, if I will, and I have to compliment Mr. Foster. First of all, he did an exceptional job in deposing my client. Dr. Russell had difficulty at that particular time. He was in the throes of suffering acute reactive clinical depression, and to deal with a client of that nature or even to cross-examine them is a real challenge for both me and Mr. Foster. But I would point out that Dr. Russell submitted, and you can find these at Excerpt of Record, I believe it's 5 pages 19 through, his contemporaneous notes. And Mr. Foster, as I would have done in his place, asked Dr. Russell, well, tell me all the events that you can remember in which you were the victim of discrimination without allowing him to look at his notes. And then, okay, is that all? Is that all? Is that all? And those then became characterized in support of the motion as the reasons, although the other aspect of this case is critical, is what about these events that in and of themselves do not constitute adverse employment action, but on their continuous everyday nature, they evidence what Dr. Russell characterized as a mindset, where he was treated differently. One of the problems we have is, and I hope you would keep this in mind, that the district court narrowed the admissible evidence on the basis that in the motions, or in the memos, that only certain ones were identified by references to the transcript. And let's assume for purposes of this argument that the ones that the district court eliminated are not before us. Try to tell us about the ones that are, have been admitted for purposes of the district court's action. Okay, correct, Your Honor. Well, first of all, there is the detailed affidavit, the charges of discrimination, that one, relate to the pretext argument in detail. They relate to the argument of his continuous complaints to human resources that were never responded. What they don't do is detail with particularity what I would call is the day-to-day complaints where the patient is placed right outside his operating room or he's denied access to the computer. But they do detail the nature and course of his complaints, the lack of response. In great detail, the pretextual issues. Now, you know, one of the problems here is it didn't go both ways when we initially filed, admittedly, a blanket objection to the statements of facts and supporting evidence by the defendants, which are wholesale, conclusory statements that there were reasons to terminate him. But they're not facts set forth in support of those either. Well, were there – this is relevant to what I was going to ask you. Sure. Were there any depositions other than the deposition of Dr. Russell? No. So what you have is the statements that were made in fairly summary declarations because you could have taken depositions but didn't, essentially. That is correct. That is correct. And, again, real candidly, being able to deal with Dr. Russell during this part of his life was extremely difficult. He was under psychiatric and psychological counseling. And that's not an excuse, but it's just a difficulty you deal with. What it means is that the opposing facts are – have really ever been investigated and they're fairly summary. I mean, it just says he was rude. He was condescending. He was so-and-so. And there's very little we can do with that except take it at face value. Well, and, again, our position is that the burden under Ninth Circuit law is very minimal in a Title VII race discrimination. One of the characterizations is that, you know, when he talks about in the trial court, well, he doesn't show how he was treated differently or treated differently based solely on his race. Well, it's his sincere position that he was, in fact, the only African-American dentist, and that was detailed at great length. There was, in fact, an African national, a dentist named Dr. Abu Tutu. But Dr. Russell took great pains to explain that he is not an African-American because he is not descended from slavery. I don't know if that's true or not, but for purposes of being treated as such, Dr. Russell's experience is there as a unique feature of having your ancestry as an American of African descent that was not present for any other employee. His charts were continually monitored. That's in the record. As cited, his very importantly and in the record is his situation got much worse in February of 2005 after he was working with a dental assistant and gave the patient an injection of Novocaine, left the room allowing the patient to get numbed up, as And he said, what are you doing? He says, well, Dr. Bader allows me to do it all the time. And he says, you can't do that. That's practicing dentistry. When you say something is in the record, I'm not quite clear. Are you talking about the record as viewed by the district court, or are you talking about materials in the deposition that were not identified? Right. Your Honor, I've tried to shift away based upon the direction given to me by Judge Reinhart to what's in the record before the district court, and I'm moving away from that. That was also part of his affidavit submitted or supporting documents submitted to the Civil Rights Agency. So, you know, that was all part of the initial moving papers as well. And also his declaration. And there was also some use by the defendants there that he had a charge or complaint at the dental board, and our position is his charge was summarily dismissed. It was advanced after he was terminated. And his resulted in censure, in fact, of Dr. Bader and his, if you will, difficulty. By the way, there was also application, and again, this is clear as can be, by the district judge without examination of the details of the facts, the same actor doctor. When Dr. Russell was hired, he was hired by mainly the former clinical director of the dentist program, Dr. Gilbert. He and she got along famously. Dr. Bader was on the interview committee. Well, I'm not sure where or how that's substantiated in the record. I looked for it. The what? That it was Dr. Gilbert who hired him. That's what he said. Where does he say that? Well, and it was clearly hired under, not under Dr. Bader's. Well, where does he say that? Well, she wasn't the director then, but where does he say that she wasn't one of the people who hired him? I couldn't find that. I couldn't find it even in the deposition. Okay. He says in his deposition that Dr. Gilbert made the decision. And Dr. Schwager, who is the medical director, stated it's good to have a full doctor. Russell, it's really good to have somebody with your level of experience. We really welcome to have a good experience dentist like you. And there's no indication, based upon the testimony of their participation, that Dr. Gilbert was more than a participant in the interview. So it's up to my position. And clearly for three and a half months during which time Dr. Russell had no problems whatsoever, Dr. Gilbert was his supervisor. I notice I have but a minute left, and I'd like to save that. Thank you, counsel. Good morning, Your Honors. My name is Troy Foster on behalf of the Appellees. Quickly turning to Judge Berzon's question, that is not in the record or anywhere supported, Judge Berzon. In fact, it's a — Well, actually, I just found a statement in the deposition where he said, but I was actually hired in June by Dr. Gilbert. And if you look at the deposition further, Supplemental Action 3, it's page 33, paragraphs 57 and 58. He makes clear that he, quote, talked to all involved on the hiring team and admits that he, quote, had no idea whose decision it was to hire. And Dr. Bader — Is there — do you have evidence in the record that says that it was Dr. Bader who made the decision? Yes, we do. Dr. Bader's affidavit states that she made the decision along with Dr. Swaggart, the CEO and the medical director. Well, I don't know quite what that means, along with. Who had the authority to make the decision? Dr. Swaggart had the authority to make the decision. Where does she have that? I'm looking at her declaration. Where does it have that? Dr. Swaggart. I think it actually is Dr. Swaggart's deposition or affidavit. So it's not Dr. Bader. Dr. Swaggart, yes. Sorry. Turning to — there are three independent yet equally compelling reasons to affirm the district court's order below. And I'm going to turn directly to the merits of the case without looking at the evidentiary issues, which we do not concede was an error. We believe the district court properly excluded the evidence that it did. But for purposes of the argument, I will turn to the merits of the entire record because affirmation is a must with that whole record. And the first point is to look at the race and discrimination claims and retaliation claims. Mountain Park's legitimate and nondiscriminatory reasons for termination remain undisputed, as Judge Berzon points out, in main part because there is nothing to refute the affidavits, which are based on personal knowledge, which state unequivocally specific facts that they engaged in. So what's undisputed is that early on in the days, in August of 2004, patients and providers and several dentists were complaining about Dr. Russell's being unprofessional. It's undisputed that 11 dentists and a patient complained about Dr. Russell's level of care. No, it wasn't 11 dentists and a patient. I wish you would just be accurate. It would be helpful. My understanding is that it was several dentists about 11 patients. Actually, that's not exactly correct. The record, Excerpt 3, page 34, paragraphs 12 and 13, it's 11 dentists and providers. So that includes a dentist and hygienist and dental assistants and a single patient complaint is the precise. Is the single state patient Maria Rangel? It is. And that's contested in Dr. Russell's declaration? It's not contested that she made a complaint. She complained to Mountain Park, and Dr. Russell would have no way to contest that because he was not present. She certainly complained. Later down the road, she did withdraw her complaint. But at the time of his termination, what Mountain Park knew is that 11 providers and a patient complained about his level of care. Well, his declaration says that while you say she filed a complaint, that she stated that she didn't have a complaint. And he says that the complaint was in Dr. Bader's handwriting. And there's Dr. Bader. I think that that's not something we can dispose of because Dr. Bader denies that, and that would be an issue. So her complaint is certainly in question, in dispute. I think that the legitimacy or the continuing nature of her complaint is in dispute. But the fact that she made a complaint at the time is not in dispute. Dr. Russell doesn't dispute that she made a complaint. Well, as you said, he doesn't know. But he has raised questions that certainly cast that assertion, but you would doubt. Right. And so I think we look at what happened from there, which is undisputed again, that Mountain Park hired an independent dentist to take an audit of Dr. Russell's files and concluded that he fell below the standard of care. Well, his answer to that is it was not a representative selection of his files. He says the files that were selected, a very small number, were all files that related to patients where he was unable to complete the work because he was on medical leave. And he has no way of knowing, and he admits that in his deposition, how the files were selected and doesn't unequivocally say that they all were because they were not selected from when he was on medical leave. He does not know, and admits in his deposition, he has no idea how the files were selected. Have you described how the files were selected, whether you just picked 12 at random or? That's not in the record. I could tell the Court, but it's not before the Court. My understanding from the record is that there were referrals made by certain dentists. Not by 11 of them, by the way. I still haven't found the 11. But there were 11 files by certain dentists who thought there was a problem. Right. Dentists or providers. They didn't purport to be random. They weren't select. They were the files that were the subject of specific complaints. Of complaints by the providers. By staff. Right. But that's what I think is in the record. I think that I don't want to go beyond the record, yes. Do I understand that you acknowledge that at least some of the files that were selected and examined were files of patients whose treatment the plaintiff said he couldn't pursue because he was on leave? No, we don't. We don't. I think that what happened was when he was on leave, the patients would come back in and complain that these were short margins or the work was improperly done. And now Dr. Russell says, well, that's because I was on leave. There are a set of those within the time that he was on leave. He would have seen the patients had he been there to correct the error. But Dr. Dishler's report is that they were still errors. The care at the time fell below the standard of care. Isn't there not a factual issue lurking somewhere in what you've just said? I think not. I think especially when you have folks outside of this time that he was on leave. And Dr. Dishler. What Mountain Park knew, which is that Dr. Dishler concluded that he fell below the standard of care. And 10 days after it received that report, it terminated his employment. And those are all undisputed. It's also undisputed that Dr. Russell lied to Mountain Park about his prior termination from another place of employment. Well, that is disputed because he says that the thing he signed did not apply to the Boys and Girls Clubs. I'm sorry? He says that the thing he signed he did not, was not a lie because he wasn't, in fact, terminated by a health care organization. No. He says in his deposition, after being pressed in his deposition, he admits that he was terminated. I understand that. But it says it wasn't by a group that was covered by the declaration that he signed. But that's not the question. The question that he was – that was posed to him, which he said he understood, was have you ever been disciplined, terminated, and so on by a health care organization. Right. And he says this was a health care organization. And I guess we can say – he also says President – So it's disputed. Again, I mean, it would be nice if you just tell the story straight. Well, it has to be admissible, Your Honor. You know that. He also contends that President Obama is an African-American and through other definitions. So we have to, and I think the Court has to, look at the admissibility of some of these allegations. I don't understand the admissibility. It doesn't seem to me to be a self-evident proposition that being fired by the Boys and Girls Club, which is not ordinarily thought of as a health care organization, is – was within this declaration that he signed. Well, I think that that – I think you're probably right in that example because it does go back to what he thinks. But there are a lot of allegations that I think the district court struggled with that we're just attacking head-on that he asserts things as fact that are just not true. I understand that, but – That aren't disputes. They cannot be disputed facts. But this one is a dispute. This one I – this one I understand. I think the second thing that is – makes this case important and clear is that there is really no admissible evidence of pretext. There's no what? Admissible evidence of pretext. I think on the – first on the age claim – I'm sorry, claim. That, I think, is easily disposed of because of the Supreme Court's 2009 gross FBL financial, where he has to come forward with but-for evidence. And there is simply no but-for evidence of his age that he was – that Mountain Park made this decision. And, in fact, in his deposition testimony, he admits that he doesn't know whether Mountain Park relied on Dr. Dishel's report in deciding to terminate him. That's Supplement – Excerpt 3 at 35, paragraphs 22. He says he doesn't know, and that's fatal. I think something that – the same accurate theory is something that Mr. Lassen holds on to, but the problem is the same accurate theory gives the strong inference. And we have Dr. Bader, we have Dr. Russell, and we have Ms. Lambert, who interviewed, and those same folks were in the termination decision as well. And in the record, it's clear that Dr. Bader and Dr. Swigert were involved in the hiring with Dr. Swigert having the authority. But the problem that Dr. Russell runs up against is what he suggests is evidence is conjecture and speculation, which is not acceptable under any standard. And even his own deposition testimony tells us that there's a thematic flaw here, because when he's questioned his deposition, again, Supplement – Excerpt 3, page 96, paragraph 192, 19 through 21, the question is, and you don't know if they, the nonminorities, were disciplined for this. Answer, I don't know. Would it make any difference? Well, as the Court knows, it makes all the difference in the world. He has to show that he was treated differently because of his race. And all of Dr. Russell's evidence shows, even the stuff that he puts forward that the district court did not consider, shows that Dr. Bader treated others similarly. As to the residents, he says that he wasn't allowed to supervise residents. Well, again, in the record, it's clear that Dr. Russell even admits that white dentists, two white dentists, were not allowed to supervise residents. He also disputes that Dr. Adututu is African American. I submit that he doesn't have the basis to disagree with Dr. Adututu. But Dr. Adututu supervised residents and as well was permitted to do those things. On the computer, he says that, well, you know, I wasn't permitted to use a computer and this is because of my race. He also admits in his deposition at page 35, paragraphs 24 and 25, that all of the white dentists used that computer and all were locked out. But he says that at first he was the one who was locked out. That's correct. He says initially. I thought it would be better if you told the story straight. Well, I think that he says initially that. And then when you read through his deposition, he does say that he doesn't know why he was told not to. It very well we would have to go outside the record to speculate. It could be that he was the first one that asked. We don't know. That's not in the record. And then Dr. Bader's procedures, he says that he was given procedures that others weren't and this was humiliating and probably because of his race again. But the record's clear and Dr. Bader's affidavit goes unrefuted that she gave such procedures to all dentists and health care providers. I mean, at the bottom of this case is whether he ought to be able to get to a jury on these issues. Yes. With these terribly bare bones declarations where he is aggregating a set of things which he was saying, including some statements to him, in which he's saying, you know, these things were – I was treated peculiarly badly and there is at least some reason to think it may have been because of my race because I was really a very good dentist. That's his view. And why doesn't he get to the jury on that? He does have some statements. So he has some direct evidence. And usually that's pretty good enough under our case law to at least surmount summary judgment, which is all we're talking about here. And I understand. But he doesn't have any evidence that ties any of these acts to race. The statements that occur occur, he admits. Well, it's essentially evidence of a frame of mind which he claims was pervading other things as well. But you have to come forward with evidence. There, in that case, there was evidence of pretext. There is no evidence of pretext here. And, in fact, as I said before, what Dr. Russell says, he attributes many of the things to things outside of race. In his deposition, even in the opening brief, he says that he thinks that the complaint to the dental board is what really perpetuated the hostile work environment. He says that that made it worse and that – so he's throwing everything at the wall. He says he doesn't know whether Dr. Dishler's report, in fact, was relied upon by Mountain Park in terminating. He said he doesn't know whether, you know, Mountain Park would have hired him at all if it had learned the truth about, you know, providing – you know, being fired from Boys and Girls Club. All of these things, Dr. Russell doesn't know and he's guessing. And there is no evidence. In the cases, I think, the Court's – it's been clear that we have a couple of comments and we have these other individual discrete acts that do not have – there's no evidence tying them to race. There's none. None in the record. And whether that's because Dr. Russell didn't want to litigate it further or want to try to attack the admissible affidavits, that really isn't the issue. So we believe for those reasons and because the after-acquired evidence doctrine would under McKinnon that the Court should affirm the summary judgment. Only if he actually lied. I'm sorry? Only if he actually lied. So that's subject to – that's not – can't be the subject of summary judgment. No. If the Court were to determine in some way, shape or form that he should survive summary judgment on any claim, we think that it would be an alternative ground to affirm because it would procedurally be barred. But you just told me that you agree that there was a dispute of fact as to whether he actually lied. I agree that's what Your Honor believes. But I don't believe that that's a dispute of fact. Well, it's nice of you to agree that that's what it is. Well, I mean, I definitely don't want to mislead the Court. I do not believe that's a dispute of fact. Oh, you said so, but that's okay. I'm sorry. Can I ask you one question? I was just looking at Dr. Dishler's letter. Yes. He reviewed 12 charts, he says. Yes. They were all the plaintiffs' – all charts that the plaintiff worked on. Right. And he says, I began my records review without knowledge of which practitioner was in question. During my review, one doctor began to emerge as someone who lacked the ability, etc. Yes. How could one doctor emerge if the only charts he reviewed were one doctor? Well, and I want to be clear on that. At Mountain Park Health Center, dentists see – patients go in – their low-income patients see several different dentists when they come in. So in the chart, there would be – they would have seen many different dentists, not just Dr. Russell. So it's not – it's not his patients. It's patients of the clinic that have seen several dentists. You say if one were to agree that the plaintiff lied... Yes. ...notwithstanding the rather pointed issues that Dr. – that Dr. Russell was terminated by an organization that doesn't look like a health care institution. But let's assume for the moment your version. You would see that as a bar to recovery of any kind or a constraint on damages? I think it would be a bar in this case. In McKinnon, they talk about egregious circumstances that would prevent not only, you know, front pay and those types of damages, but also back pay. Here, I think that whether to the outsider the Boys and Girls Club is a health care facility or not, Dr. Russell was practicing dentistry within the organization. And... It wouldn't be very egregious if the plaintiff didn't perceive the question as addressed to being fired by a Boys and Girls Club. Right, but I think that the discovery within the record shows something different, because he not only did not tell Mountain Park at the beginning on the credentialing application, but when you look at the discovery, he failed to disclose. In very broad language, we asked, have you been terminated from any other position? He said no. So I think that – and from there, in his deposition, he was not – until he saw documents, he did not make those admissions. So I think the discovery and the disclosure on the record are the egregious facts that continue the lie that began. And I think that that's what, in McKinnon National Publishing – It's not going to lead to sanctions within the lawsuit, but it's hard to see why it would lead to after-acquired evidence rule other than if he weren't asked the question to begin with. If he weren't asked – I'm sorry. If he weren't at the – to begin with, asked the question of were you terminated by anybody, let's just – if that were a fair reading of the contract, then the fact that he lied in the deposition in the discovery might lead to sanctions within the lawsuit, but I don't see how it would lead to an after-acquired evidence rule. Well, I think in McKinnon, in cases like that, it's where the plaintiff continues the lie or the dishonest conduct throughout that, of course, the Supreme Court bars recovery. And we think certainly this is a case like that. At worst, it's a case where there should – that there should be certainly no front pay. And, again, my argument was based on the assumption that this Court may decide that the district court erred in not admitting certain evidence, and I addressed all of that. We believe that the district court was correct, and it was not an abuse of discretion to exclude that evidence. Thank you, Your Honors. Your Honor, in response to your question about what is, in fact, the record, Mr. Foster has agreed yet again that the record is the entire record submitted. And that has always been their position. Even, in fact, they responded to our motion for reconsideration and actually submitted, if you look at the appellee's excerpts of record submitted in support of their initial motion, it contains essentially the deposition of Dr. Russell in its almost entirety. We submitted what else is there. And to a point, and it was the basis of our objections, if you, as you often do in trial, read the line of questions in their entirety, they support, in some cases, just the opposite view. Real briefly, on the issue of age, age, as you know, sometimes is used as a synonym for experience throughout Dr. Russell's claims. And you can see this on Excerpt 3, pages 34 of 45, where the residents sought him out, wanted his experience to supervise them, and they were denied that. Dr. Swaggart later says, well, you're too fast. They can't follow the procedures that you follow too fast. So, same with some other things. He was, there was a brand new, just out of residency endodontist, and this gentleman said, you cannot save that tooth. Someone asked Dr. Russell to do it and says, I can save it. He did a root canal and saved the tooth, because he had done so for 20 years. So that's all I have, Your Honors. Thank you. Thank you, Counsel. Case discarded will be submitted.
judges: Pollak, Reinhardt, Berzon